Mr. Mann. Mr. Chief Justice, and may it please the Court, there are four points I would like to make this morning. First, the plain language of Exemption 2 dictates an extremely narrow category of materials, those related solely to internal personnel policies and rules. Second, even if you look beyond the plain language and look to the legislative history, you will find that the plain language of Exemption 2 dictates an extremely narrow category of materials, those related solely to internal personnel policies and rules. The legislative history is focused, the additional legislative history from the House is focused only on law enforcement or investigatory materials, items that were covered through the 1986 amendments to FOIA, making any additional judicial high too unnecessary. The third point, because of FOIA's purpose, if you find that the language, the plain language is not clear, or if you find that the legislative history is insufficient, then the focus must be on an interpretation that supports disclosure, not secrecy. And finally, Congress, in enacting FOIA, conducted the balancing. In reserve for it, itself, the authority to add to or expand FOIA through Exemption 3, it did not leave agency discretion available for the agencies to decide what documents they can provide or not. Moving into our first argument, the plain language. That issue is a very short sentence, related solely to internal personnel rules and procedures — and rules and practices. Congress chose to use the words related solely on purpose. That's an extremely narrow view. Now, we understand if you look at the words in isolation, perhaps you could see that there is some conflict between related, could be broad, solely is extremely narrow. But when read together, as they should be in this statute, related solely is an extremely narrow class of documents. Alito, the D.C. Circuit's decision in Crooker has been the leading decision in this on this issue for nearly 30 years, and there's been a great deal of reliance on it, certainly by the lower courts in general, and perhaps also by Congress and by the executive branch. Do you think there's anything to be said for deference to that decision based on the fact that it has been, there has been reliance on it to such a great degree for such a period of time? No, Your Honor. When Crooker came down, the Court was faced with an extremely, a circumstance dealing with these FBI or ATF, certain seizure manuals, and the Court adopted and created the High 2 exemption. But again, we believe in 1986, Congress dealt with that expressly, explicitly, and took the exact same language and inserted it into a standalone exemption, Exemption 70, making Crooker no longer needed or necessary. Now, the fact that Court I ask the question because the world has changed in a lot of ways since 1981, and one is that there is now, I think, much greater concern about the disclosure of information that has perhaps profound security implications. That was not as much of a concern in 1981. If you think about, for example, suppose there is a Federal building with a hallway that is accessible only to somebody who has a code key. Would that be, is that, does that have to be disclosed under FOIA or architectural plans for a Federal building that would disclose the size of a bomb that would be necessary to bring the building down or bring part of the building down? Is there any FOIA exemption that covers things like that? Well, Your Honor, there could be a variety of FOIA exemptions that could fit under 7, depending on whether or not it's law enforcement related. For example, if it's FBI instructions on guarding a facility or guarding individuals, perhaps that would be law enforcement, and if it's protecting individuals within the building, under 7F. Or it could be something addressed specifically through Exemption 3. And coming to your original part of your question, the times have changed. We recognize that. And Congress recognized certainly that times could and would change when it adopted. And that's why we believe Congress kept for itself Exemption 3. Ginsburg. Even though you said that there is now Exemption 7, the amendment to that, so you don't need 2, still, as far as I know, every court of appeals that has weighed in has accepted Prooker. And I was a little puzzled why you were so intent on rejecting so-called High 2, because after all, in this very case, Judge Fletcher dissenting is true, but he said he accepts Prooker, he accepts High 2, and he still thinks you win. So you don't need to reject Prooker to prevail. We don't need to project under Judge Fletcher's viewpoint, we did not need to reject High 2 to prevail. But, again, he was the dissent. But more importantly, Prooker, again, we think this language, this case, rises and falls on the plain language of the statute. And Prooker was an expansion of that. And we need to accept that Prooker was an expansion of that, and Congress accepted that it was an expansion when they came up with 780. Breyer, why does that show that? Why doesn't it show acceptance of Prooker? I mean, if Prooker was interpreting Section 2, the interpretation, everyone had followed it, every court, nobody disagreed. All your four arguments Judge Edwards went into thoroughly, everyone but Judge Wilkie approved it. And so Congress reads that and they make it specific in 7, but they say nothing about 2. I think there are three points to look at on that. First of all, Congress originally did look at amending Section 2, Exemption 2 at the same time they looked at amending Exemption 7. They chose not to. Now, we can't read everything into that, but they chose not to. They made 7 specifically, and 7 covered all of the language that we would be looking for. So really, if you are still reading Exemption 2 to include a High 2, then 7e becomes superfluous. And then a final point, and I think a very important point. Scalia. It might have been a different Congress. I mean, the Congress that passed the law is not necessarily the same Congress that failed to amend the law. Are we to consider laws to be in effect only for so long as the Congress that passed them is sitting, and then the failure to make any changes in light of judicial decisions by later Congresses effectively amends the law? No. It's an extraordinary proposition. No. That's not the proposition I'm making. The proposition I'm making is that when the 1986, 84 through 86 took place and looked at this, and they saw the issue with Jordan and they saw the issue with Crooker, their decision was to consolidate that exemption, what had been called High 2, into 7e. How do you know? What we have is 7e in front of us. 7e says we want to be sure something like Crooker's interpretation of 2 applies with law enforcement. It's simply a case so they apply it with law enforcement. Absolutely, now it's guaranteed. Crooker is not guaranteed because it could be overturned. We never know what will happen. But what in that suggests they don't want Crooker to apply to the Fed, for example, or to the Navy, or to what is here storing, it's storing explosives? Why would Congress – I mean, I can't get anything one way or the other from the fact they've passed 7. Why should I get one rather than the other? For every argument you make, I can see an argument the other side that they make. Well, another point that I would make. What's your answer to that? That was a question, really. Well, my answer is, is you're correct that they did not read – they did not specifically state what they were doing or why. So all we can do is look at what they did in reality. Sotomayor But there was a proposal to amend 2. And there was a conscious decision by Congress not to do 2 to conform to Crooker more generally, but to only pass 7. So there has to be a meaning to the decision to limit the amendment. I would believe that they – backing up to Crooker, if you look at the arguments in Crooker, and you look at, I believe, every point in Crooker where they discussed either the legislative history or they discussed other case law analysis leading to High 2, it was focused on these investigative materials, examiners' materials, manuals, manuals that we didn't want the regulator to have an opportunity to have. And that's all now captured in the decision to amend. Sotomayor It was interpreting – it was interpreting the law. Scalia You assume that there's always a reason for Congress's not passing a law? I mean, it's hard enough to figure out their reason for passing a law. But there could be an infinitude of reasons why a law is not passed. I accept that, Your Honor. Scalia Do you know of any case in which the failure of Congress to amend a law in order to overrule a court decision other than a decision of this Court has been held to be an implicit approval of that decision? Do we have a single case where we've said, oh, there was a line of court of appeals cases, and since Congress failed to amend the statute to take account of those court of appeals cases, Congress must have approved them? Do we have any case like that? No, we don't, Your Honor. Scalia I don't know of any. Roberts Your Honor, but I would like to make one additional point on this. What – by doing what Congress did in 1986, and again, they're not telling us this, but we can look at the statute. What they've done is preserve once again that clear, distinct line between the exemptions. Exemption 2 on its plain – now, exemption 2 under its plain language is for these related solely to internal personnel matters. That's an isolated exemption. We don't need to go back to it to look abroad and start looking for other exceptions. We have Exemption 7e now to handle that. So there's a clear, sharp dividing line. And as this Court said in Rose, actually quoting Vaughan, that we needed that sharp dividing line. Agencies know. Sotomayor Counsel, in Rose we talked about a legitimate public purpose in seeking information. I tie my question to Justice Alito's, which is at what point does – is it legitimate for the public to seek information, internal information relating to the rules and practices of personnel? Can the public seek information that places the community at a severe security risk? Is it possible for us to say that that kind of information, given our line of reasoning in Rose, could not be legitimate public information? But it does not have to be using the exemption 2, as it's stated, for the internal personnel policies. There are other reasons and ways that some materials that might create a security risk can be protected. Congress has – there's over 150 – I believe the number currently is 153 statutes that they've enacted under Section 3, using Section 3. That includes as recently as last year when the Department of Defense v. ACLU case came before you, Congress – that was dealing with the Obama-Girard photos – Congress stepped in and passed an amendment to the Security Act to exempt those documents specifically from release in order to protect. And that was using the proper authority. It didn't require an agency to go back and rely on an Expand 2, Exemption 2. And that's the danger of the expansion we're looking at, is it allows Exemption 2 to be used for an open-ended, any time an agency feels it may be appropriate that it might not want to release something, it can rely on Exemption 2. That was never the intent. Congress tried from the beginning to preserve for itself that discretion and that authority and to remove the discretion. And as we point out, we've set out for you on our briefs, if you look at the legislative history, many of the agencies and Department of Justice that came before Congress asked for that discretion. And Congress did not give it to them. They reserved. Instead, we have Exemption 3. So what we're saying is that you do not need to – there may be reasons that you want to take high-security information and have it isolated from the public's review, but it's not through using an exemption that was really designed for minor internal matters. Kennedy, of course, if that's the outcome of this case, and if you prevail, that would mean that more things would be classified and withdrawn wholly from scrutiny, whereas if other exemptions are used, they can be shared to a greater extent. So really what you're arguing for is for withholding more information from more people. I don't think I am, Your Honor, because I believe that through the Exemption 3, they can't limit it to, for example, in this case, if there was a need for Congress to adopt a specific protection for these maps, it could. The problem that we have here in this case, again, is these maps at this base have been given out, and again, it's a map. It's a map showing the range, the size of an explosion, and its effect on the surrounding community. That map has been given out from this base to some people, and some of those people I gave it to actually gave it to the newspaper. It's been not given out to others, including my client. Other bases nearby, our Bangor Trident submarine base, gave out the map upon request. If this map that we're looking at is that secure, then perhaps it should be that secure and protected across the board. But that's not what we have. We have — instead, we have an individual within an agency making a decision to withhold a certain document from some people and not others, and when they give it out to the others, they have no control over what those people do with that map. And that's not a correct use of the exemption 2. Breyer, I mean, they want to know how wide the corridors are in some Federal buildings, and terrorists could use that for bad purpose, but we want to give it to the firemen because they'll use it for a good purpose. We want the policemen to know. We want different civics groups sometimes to know, but we want it to keep the limitation of the restriction, we want it restricted, restricted to minimize the chance it'll get into the wrong hands. I mean, I don't see anything illogical about that. What's illogical about that? But it shouldn't be through Exemption 2, because it's not an interest. Well, that's a different argument. I mean, your four arguments seem to me to be the same arguments that Judge Edwards and the D.C. Circuit considered. And they're excellent arguments, and they're arguments on both sides, and then they considered it and came to a conclusion. But this is a different argument you're making here, and I was addressing that. It's a different argument in the sense that what Judge Edwards was looking at and the Crooker decision was looking at was a specific group of documents, these manuals of policy and procedure. And again, we believe that that was addressed through the 70 in 1986. So we're back now to should there still be a High 2 category, is that how we want to read this? Breyer, I mean, it's only addressed from law enforcement. There are many dangerous or, for example, this isn't law enforcement, this is munitions. The Navy thinks, rightly or wrongly, I guess you could, that they don't want these maps circulated because they think it would make it easier to blow up the munitions. They want the firemen to have them, they want the civil defense workers to have them, but they don't want people who might blow them up to have them. Now, that's their reasoning. Now, that isn't addressed, it seems to me, in the 7, because 7 deals with law enforcement. I would agree that this perhaps is not addressed in 7. 7 was argued before the Ninth Circuit, but not answered on whether or not these fit under 7. But again, it should not come back to the use of Exemption 2. Perhaps it's not addressed in 7. Ginsburg. Ginsburg. As I read the D.C. Circuit's decision, you are assuming or suggesting that the D.C. Circuit has filled that gap, and now the add-on that the D.C. Circuit made is no longer necessary, so we lop it off. But the judges are on that in Bank Court, thought that they were interpreting the statute going through all of the steps that you outlined. Language is rarely so plain that there's no room for a different interpretation. And then Judge Edwards looked to the legislative history to see how that might inform the decision. But really to suggest that Crooker was just sort of a stopgap until Congress amended the statute, I think, is not fair to that decision. Your Honor, the issue here is not so much Crooker as it is what the Ninth Circuit has done to, we believe, expand Crooker. Because you're correct, I mean, obviously the Crooker decision was a well-written, long, and very detailed decision, both the en banc as well as the dissent, but the dissent. But even there, they were looking at that same legislative history. And it's the same legislative history that this Court looked at in Rose, and there was a limit. They didn't say that it needed to reach all the way out to cover anything as broad as the categories what the Navy is proceeding with here. They looked at manuals of procedure, the disclosure of which would enable the regulated community to circumvent those agency regulations. And can you address that as arguably dicta, but that's the statement you had made in Rose, by the regulated to circumvent regulations. The documents we have, for example, in this case are not. The regulated entity under the Operator 5 manual is the Navy. It's how the Navy stores and moves its munition around. So even under a reading of Crooker, what Crooker was looking at, looking at the House report, taking the House report on its face, taking the testimony before Congress that was on its face, again, that was still dealing with these operating rules and guidelines for government investigators and examiners. Scalia. I thought you disagreed with the premise of Justice Ginsburg's question. That is, that you assert that the language related solely to the internal personnel rules and practices of an agency is quite clear. I do. I thought maybe you were abandoning that. No, no. I mean, I — but what I was saying was that we do believe it was quite clear. But if — even if you went beyond, which obviously they did in Crooker, and obviously you could argue from the House report, even if you go beyond, it's still a limited category that does not reach so broad as what the Ninth Circuit has opened up here and as what the Navy is arguing before you now, which is even broader than what the Ninth Circuit reached. How is it broader? I look for the words. I just missed them, and you can point them out. When I read about the circumvention, what Crooker says is, We hold that since the document for which disclosure is sought meets the test of predominant internality, and since its disclosure significantly risks circumvention of Federal statutes or regulations, it is exempt. It didn't say anything about circumvention because there is a regulated entity and it is that regulated entity that will circumvent. It just spoke of circumvention, as far as I saw. But maybe there's another place where it talks about regulated entity, is there? Well, I believe it's addressed in the decision during the context leading up to the decision, but it is addressed by this Court in Rose that we're looking at. Breyer. But if we're looking at Crooker, I just read the words, would there be circumvention. And it seemed to me in this case, the Navy has plans and they use those plans to store munitions safely. And the risk that they worry about is someone will get a hold of the plans and use the positions of those munitions in order to make them unsafe, for example, blowing them up. So that seemed like a very serious circumvention of what the regulation was there for. But not by the regulator. That's correct. And I didn't find anything in Crooker that said, and I don't know why you'd have such a theory, I don't know what the point of a theory would be, that you would care whether blowing up took place by somebody who technically was regulated by the Navy, or blowing up took place by some other person whom they're worried about. Because the basis for that is, again, this Court's language in Rose where it looked at, when, again, we're going back to a very few words in the House report. And the House report is looking at these guidelines and manuals of procedure for government investigators or examiners. This Court took that language and looked at it and pointed to, well, and it's a logical extension that if we're looking at from these investigators or examiners what we're concerned about is people being investigated or examined. So you don't see that that expands here. And, again, it's coming back to the basis of this material shouldn't be under I-2. I mean, we can discuss and debate the merits of the safety of these maps. This is, again, a map. It's not the operating guidelines, the Operating 5 manual. That's not what was requested. It's not what was before you, but what's before you is the map. The map which shows that the largest target, no surprise, is the loading dock. The loading dock, and we have the materials in the Joint Appendix from the base information proudly discussing that loading dock and how visible a signal that loading dock is. Alito, just out of curiosity, do you have any reason to believe that the current version of the ESQD map is different from the one that was published in the newspaper previously? We do not know, Your Honor. There are identified, I believe it was 14, but it may be incorrect, separate maps in the Vaughan Index. We know if you read the portions that we have from the Operating 5 manual say they can move munitions around as long as they stay within the confines of the ESQD map, but it appears the map can be amended. And, again, that's the prevailing question here, is we're talking about public waters, private land around the base, and whether or not that land stays secure. That's the great significant public interest here, is we have a city within a mile and a half of this base and of this very visible loading dock. It can be seen from everywhere. On the waterfront restaurants in town, this loading dock stands out. So whether that map changes over time would be important to know. If there are no further questions, I would like to reserve a couple of minutes. Roberts, Thank you, counsel. Mr. Yang. Yang, Mr. Chief Justice, and may it please the Court. Petitioner has asked this Court to disrupt 30 years of FOIA practice by rejecting an interpretation of Exemption 2 that has prevailed and has provided a workable standard for agencies in the courts since the D.C. Circuit's en banc decision in Crooker. Sotomayor, could you tell me what the textual basing for Crooker's predominantly internal and circumvention of agency regulation requirements is? Where in the text are those words, and how do you create them except through sort of judicial practice? Yang, Well, I think the as our brief explained, there are three basic elements to Exemption 2. The first is the internal element, and we believe that means that the records at issue must be properly maintained within an agency and not for general release. Sotomayor, The problem with that in this case is that it's a mixed document. It is predominantly for internal use, but not exclusively. Yang, Well, I think Sotomayor, So how do you square that with the words related solely to internal? Yang, If I could just finish the internality and then talk about how it relates solely, it relates to that, I think that would be probably easiest. The internal, and when a document is properly held within an agency as internal, reflects the FOIA balance that's at issue throughout the exemptions. It involves the balance between the public interest in knowing information about the government and the need for the government to maintain certain things in confidence. And in this context, Rose addressed two other contexts. Rose explained that when there is no legitimate public interest, things may be properly internal. There's simply no reason to disclose it. Sotomayor, Well, the case summaries there were internal solely. They were created only for purposes of the agency's honor code review or discipline  Yang, Well, if it was Sotomayor, and yet we ordered it disclosed. We created an exception to the plain language of the rule, it seems to me. Yang, Well, I don't believe this Court created an exception to the statute. I think what the Court did was construe the statute. And although it is not clear from the text of Rose exactly the textual foundation for that decision, I think it is best read as turning on the internality and understanding what is properly internal under Exemption 2 must be understood in light of what FOIA is doing and what the legislative history suggests for the exemption. And so what we Sotomayor, Oh, I agree, but I think the distinction it made was that it's only internal rules and practices of the agency, of personnel agency, if the public has no legitimate interest in it. Yang, Well, I think it said that that's the case where there's no countervailing interest on the other side, at least where there's no risk of circumvention, is what the Court was saying. What we have here is a different FOIA balance. What we have here is something strong on the government interest side. There are certain things that just cannot be disclosed to the public and have the government function well. This is one of those. The location, type, amount of munitions stored on a naval facility, level of ammunition location. The information about location, I thought, was disclosed, where these explosives were stored. There is a, for instance, the appendix includes a map of buildings. It doesn't explain where munitions are stored, the type of munitions. But we know they're in the building. We may not know precisely. Maybe not in every building. What you know is that there are buildings, there are sites, but you don't know which types of munitions. And what we're talking about is more than a map. What we're talking about is more generally the ESQD information in the disclosed records, which includes. Ginsburg. And I thought that that information was given out to the Bangor facility, that the ARC. There appears to have been a release, and the record does not provide us detail as to why, before 9-11 by the Bangor facility of some ARCs. Now, it's important to know that ARC maps have different levels of importance. For instance, you might have an ARC map around a bomb squad on a base, because bomb squads need to maintain a small amount of munitions. But that ARC isn't particularly sensitive. So ARC maps might be released in certain contexts, and the Navy here actually does conduct a case-by-case balancing to see whether or not it would be appropriate to release this information. Here, what we do know is that the Navy looked at the ARC maps here, which are highly sensitive maps, as well as the associated ESQD information, and determined that releasing this information would provide a road map to those with bad intent to circumvent the very safety procedures that you're supposed to do. Ginsburg. Have you compared the two situations in Seattle and in Bangor? Because the two are very similar. Our brief briefly addresses this. I believe it's footnote on page — footnote 5 on page 8. And what we can say from the record is that the Navy looked at the material here, explained that Bangor is a single weapons facility, involves a much more simplistic storage and safety security problem than the Naval Magazine, Indian Island. And also, I would note that Roberts. If these maps are so sensitive, as you suggested, why weren't they classified? Well, it's difficult to classify when you need to share in limited circumstances with local responders. The Navy here has shared I'm sorry, I don't understand that. It's difficult to classify when When you classify a document, it restricts access to people with a Federal need-to-know, people who have been adjudicated as eligible to receive classification and receive the proper training. The Navy, in this instance, needs to share limited ARC information with the local fire department and the police department to make plans in the event of an emergency. And that was shared in confidence with these local force responders and was unfortunately disclosed without our authorization. Well, surely you classify documents that are shared outside the Federal government. That is true in certain circumstances, but there are other circumstances. Could you classify these maps after, I mean, assume that you don't prevail. Could you then classify these documents, preventing their release before they're released? Well, if the Court were to provide us with the opportunity, I think the Navy could consider it. I mean, isn't it the case when a government agency has to go through its records in response to a FOIA request and comes upon records that would otherwise be disclosable, they can at that point say, we're going to classify this so we don't have to disclose it. The relevant executive order that governs classification does allow classification of materials which have been disseminated beyond the government. But there are certain thresholds that have to be met. I'm not an original classifying authority, so I would not be in a position to say whether these types of things could be classified in this instance. It's at least theoretically possible. But I what I want to underscore is that the reason that these materials are not classified in this instance is because it is important to share with the local FOIA department. Now, the local FOIA department. Alito, there's a document on the FBI website called Security Clearance Process for State and Local Law Enforcement, which seems to address exactly the situation in which there's a need to — it says it is the policy of the Federal Bureau of Investigation to share with law enforcement personnel pertinent information regarding terrorism, and it provides a procedure for sharing that classified information. It is — I don't mean to suggest that only Federal government employees can have classification. You can. You have contractors. There are instances where you can classify material and share it with non-Federal entities which have been given appropriate clearances. Roberts. Roberts. It seems to me you're asking us to do your job. You've got to go through these documents and say you're telling us how sensitive these are, and therefore it would harm the national interest if they had to be disclosed. That's true you can classify them. And instead of coming to us and saying you should torture the language in FOIA to allow us to determine that this is sensitive to the national interest and therefore shouldn't be disclosed. I don't believe that we are asking the Court to torture the language of FOIA. I mean, we think that we have a fair reading, by no means an unambiguous reading of the statute, but a fair reading of the statute. And it's a reading that has prevailed for almost 30 years now. And it applies to the audience. Kagan. Kagan. Let's talk about the meaning of the statute. The key word is — the key term is personnel rules and practices. If I said to you, what's a personnel file, what would you say? Well, it depends in context. You may be referring to Exemption 6. I could be referring to Exemption 6, or it could be referring just generally, just in a conversation. Your personnel file, what does it mean? Well, in the context of Exemption 6, I think it refers to files pertaining to personnel. Can you think of another context in which it means something other than that? I think the term, the phrase personnel file itself is normally referred, normally used to refer to personnel. It's a kind of HR file, right? That's generally true. And so why should there be any difference if you look at the term personnel files and practices? These are HR files and practices. Well, it's certainly one reading. We think that personnel rules and practices of an agency can fairly encompass instructions that you provide to personnel. For instance, if you were to instruct personnel that they are to prepare at work at 9 and leave at 5, or they are to perform a certain number of duties, 10 cases per day, or you need to process these cases in a certain manner, all of those I think would be fairly characterized as personnel rules and practices of an agency. Scalia All the rules of an agency would be sucked in, wouldn't it? I mean, whatever rules the agency promulgates are supposed to be enforced by the personnel of the agency. So they become personnel rules and practices. The focus on personnel in the statute helps to distinguish between rules and practices which govern personnel and rules and practices which also are there to govern the public in its interactions with the agency. And this goes back to the question that we initially started on. Relate solely, when you are related solely to the internal personnel rules and practices of the agency, it extends just beyond just the rules and practices of themselves. But it makes sure that the focus solely is still on personnel. So there are things, for instance, if the rule is that you need to file a FOIA request in a certain way and the agency instructs personnel to process it in a certain way, those rules also would affect the public. The public would need to comply. If there is a dual purpose, a dual function of the rule or practice, it would not relate solely to the internal personnel. Sotomayor Well, that begs, I think, Justice Scalia's question. One could argue that everything that the agency develops, except rules telling the public how to come to the agency with a complaint, et cetera, virtually everything will govern either the internal personnel practices or the agency's practices vis-a-vis the public. But not everything that the agency does will relate solely or exclusively to govern the internal personnel rules and practices for personnel. When there is a dual function, that is, it both instructs personnel how to do their duties and is also something that the public must take into account. Kennedy Well, if the agency has a rule that says put Explosive A in Building 1 and put Explosive B in Building 2, that's hard for me to explain. It's just a personnel rule, other than, as Justice Scalia says, everything else, all functions have to be undertaken by humans. Sotomayor Well, I don't know that I would agree with that. I think the personnel rules and practices that are at issue here are a complex set of rules that are based on types of munitions, the assaults. Kennedy Well, what about my hypothetical? Why is that a person, primarily or solely, personnel rule? Because it is a rule that pertains to the personnel. It is a rule that governs the personnel's discharge of their duties. And if the person Kennedy That goes back to the point that I forgot about a computer age, but forgetting that, humans have to do most things now. Sotomayor That is true. Humans generally, and we still do, thank goodness, do things. But the focus of the exemption in context, the exemption applies to matters that the agency. Personnel helps to focus the inquiry on the rules, and again, only relating solely, on rules that govern agency personnel as opposed to rules that might govern those personnel and govern the public's interaction with the agency. That, I think Scalia I suppose the Office of Personnel Management has a pretty broad charter, then, on your theory of what the adjective means. OPM must be a very powerful agency. Well, I think it certainly is. But I think what we're saying is that personnel can have different meanings in different contexts. Ginsburg Can we go back to the origin of the Exemption 2? I thought there was a concern in Congress that under the APA, Section 3, was shielding too much from the public, and so they wanted to have a narrower category. And listening to you, I really don't see how we have something that's narrower than the old Section 3 of the APA. And if you can give me an example, this is what the APA shielded. That would not be shielded under Section 2. Maybe I would. Well, there were – I can give you a few examples from legislative history, for instance. One of the problems that Congress was concerned with is that the old exemption in Section 3 had been construed to apply to internal management, including things such as phone books, agency phone books for personnel. That would no longer be encompassed. Things like budgets that the agency produces, that arguably was internal management, that that would not be under the internal personnel rules and practices of the agency. And I think it's important to remember that when Congress drafted this statute, it initially started with internal personnel – or, excuse me, internal employment rules and practices, and changed that to personnel. In the report that effectuated that change, the explanation, and the only explanation, was that that change was similar, made the exemption similar, but more tightly drawn than the APA's management exemption, which at the time existed in another part of the statute. It was a cross-reference. When Congress then continued to revise the statute, the House made very clear in the hearings, in the House report, and on the floor, that its intent was to cover these types of manuals and instructions to agency personnel, when doing so would risk the functions that were at issue here. And when Congress in 1986 amended FOIA by adding or amending Exemption 7e, it ratified the existing rule. And it did so because it ratified it and it had to – it extended it in two important ways. Crooker left open the question, or at least made it vague, as to whether prosecution guidelines would be protected by Exemption 2. The reason that was unclear is because the D.C. Circuit had previously concluded in Jordan that Exemption 2 did not apply. Crooker rejected all of Jordan's rationale, but then someone enigmatically said, but we would reach the same result. Justice Ginsburg's concurrence explained in Crooker that this muddied the waters. And when Congress revisited FOIA in Exemption 7e, it specifically provided an exemption for law enforcement investigations and prosecutions. In doing so, it made clear that whatever existed of Jordan was gone. It also did something else. Roberts, I would have thought the amendment to Exemption 7 really cut the other way. They amended Exemption 7. They didn't amend Exemption 2. Well, they amended Exemption 7. This is my point. Roberts, to adopt more or less Crooker, right? To adopt Crooker in certain areas. Exactly. Not this one. Well, no. I think what it did is it took Crooker as understood, but what it did is with respect to law enforcement records. And remember, it's only records compiled for law enforcement purposes that would disclose techniques, procedures, or guidelines for investigations or prosecutions. In that context, Congress lowered the bar. It provided more protection for those law enforcement records than Crooker did. This is part of what Congress was doing in Exemption 7 more generally. And this Court's decision in Reporters' Committee discusses this. Before 86, Exemption 7 applied where disclosure would cause a bunch of these harms, these enumerated harms. Congress changed would to most of the subprovision in Exemption 7 to could reasonably be expected to. And they did so also in Exemption 7e, where, with respect to the guidelines provision, when guidelines for law enforcement investigations or prosecutions could reasonably be expected to circumvent the law, that's what the Exemption covers. In doing so, it's providing Congress decided to extend Crooker. It extended the protections by lowering the bar in 86. And it also, as we've discussed, did so to specifically address the D.C. Circuit's decision in Jordan, or at least what might have been left of that after Crooker. We see that as simply building on the back of Crooker. And it did so specifically in the law enforcement context, but it did so just with the premise that Crooker had properly understood Exemption 2. And it's important to remember that law enforcement context in Exemption 7e will only apply in a certain subset of instances. It has to be compiled for law enforcement purposes. It has to be disclosed techniques, procedures, or guidelines for law enforcement investigations or prosecutions. Breyer, what happens, I'm just curious, on if you classify, suppose you have a document. In case of emergency, these are the evacuation procedures of a big Federal building. And now you want to show that to the fireman, but you don't want it to be in the newspaper. All right. And the firemen don't have classifications. They aren't cleared. Right. But I guess if, in order to see it, they'd have to be cleared. They would have to, right. How long does it take, approximately, roughly, to clear a fireman so that he could, in fact, see the evacuation manual from the Federal building? I don't know exactly. Can you give me a rough idea? I'm going to speculate a little bit on this, and if I'm wildly off, we'll let the Court know. I think it's on the order of 6 months, but it could be longer. For what level of classification? I gather the investigation of the person is quite different depending upon what level you want, if you want to give me. I think that's for the basic secret, but I would have to, again, I don't have a precise answer for the Court, and we could provide a more fulsome answer. The lower things below secret. Right. Are those sufficient classifications to prevent disclosure under FOIA? What is it, sensitive? Yes. Confidential, I believe. But, yes. Yes. So if you label something confidential, you don't have to disclose it under FOIA. Right. But classification is not something that the executive can do, of course, just willy nilly. There are certain criteria that have to be satisfied, and there are certain practical storage access requirements that come with classification. Do you think it's practical to classify all of the information that might have security implications? I think it's difficult. It's certainly. Architectural designs, passwords. I don't think if we go that far it is practical. Plus, in many contexts, there won't have, there won't be national, cognizable injury to the national security, which is the touchstone of classification. So there are things, you know, there are many types of information out there. For instance, internal procedures regarding computer security for agencies that just would not normally be thought of as something that's classified. Agencies also provide guidance to personnel, for instance, in screening Medicare claims that come in. I'm sorry, you wouldn't regard internal security procedures for computer systems as confidential? Not classified as confidential. In order to be classified, there has to be a determination by the original classified authority of many things. But among other things, it has to show that disclosure of the information could reasonably be expected to damage the national security. Would you classify those as internal procedural rules, personnel rules? And would you also classify architectural specifications as internal personnel rules? It depends on context. I think the computer security instructions to personnel, how you access and what criteria you must build your computer systems to be secure at, I think that would be deemed as internal rules and practices for, of an agency. What about architectural specifications? It can. I mean, I think it's a little misleading to talk about architectural specifications or maps. Those are simply methods by which you convey information. You could also write things out longhand. It would take a lot longer, but you could write out the same information longhand. So long as it fits within the rubric of internal personnel rules and practices of an agency, that is, it is providing guidance, it is providing rules and practices for the agency's personnel to follow in conducting the agency's functions, it could well be deemed to be fall within Exemption 2. Not everything would be, but certain things could. Sotomayor, so basically anything that the agency uses to craft its internal employee practices and rules gets swept up as private, as internal? Meaning, if, if? No. It certainly would be personnel rules and practices of an agency. To be properly deemed internal, that's where you, the circumvention problem comes in of Croker. And we believe that in order to be properly deemed internal, the disclosure would significantly risk circumvention of the agency's functions. So you're taking out the records related to personnel and not making it a condition of the disclosure. You're saying if any document circumvents the agency's functioning, that's exempted.  I didn't mean, if I gave that, if I said so, I certainly didn't mean to give that impression. There are certain, there are two different. Sotomayor, so how does, how do the documents that the agency reviews to determine and craft its internal rules and practices fall under the rubric of being related to, solely related to personnel practices and rules? If they were created separately, if they were created for multiple purposes, if they were used in different circumstances besides the relationship of employees to others? To bring us to maybe this case to give an example, this case involves the ESQD information for Indian Island. That information is a personnel rule or practice of the agency or is related to it because it tells the Navy's personnel how to store, how to move, how to. Sotomayor, the map doesn't. You use the map to do flatter things. Well, I guess it's a question of how you convey that information. If you said you can't get within 1,000 feet of point X and wrote that out as an instruction, that's one way to do it. The map is another way to do it. The map simply. Sotomayor, I'm sorry, I'm cutting you off because your light is on. Do you see any difference between the position you're taking and Crooker? No. You formulate your tests very differently than Crooker does. What are those differences? I think it's essentially the same. Let me tell you why. Crooker uses the predominant internality test, right? And there's essentially two things that the Court is getting at there. It says that that means that the agency function of the issue can have an impact beyond the agency. That was kind of one aspect of it. And two, the Court was concerned about not having secret law. That is, things that the public would have to know and use in interacting with the agency. We think that that's essentially the same thing that we're doing. And if we assume that a majority of this Court finds this statutory interpretation untenable and that you lose, but that the Court is also concerned about the government's reliance interests here and about the set of documents that have been exempted under Exemption 2 that would become unexempt, is there anything that the Court can do about that? Is there anything that the government would need to advance, to deal with those reliance interests? You're assuming that we lose the case entirely. I am assuming, yes. It's just an assumption. All right. That's not an assumption I like to deal with often. But, well, I think if the Court were to rule against the government on all respects, I think that that would leave us with the option of returning to Congress. This Court, of course, is free to opine on all respects. Breyer. If you couldn't go return to Congress and you had to classify documents falling into the category that you previously thought fell within Crooker, how long would that take? How many documents would you guess there were in the Federal government? Billions? Thousands? There's a very large number of documents where disclosure would circumvent the very agency functions at issue, not all of which, and perhaps very many of which, would not be able to be classified. And all of which you already have to review to compile the Vaughan Index and to make sure there are not other exemptions that are applicable, right? You just don't grab a bunch of files and turn them over. You look at them before you release them under FOIA. That's true. It's just that the Exemption 2 serves a unique and important function. That wasn't my question. My question did not concern those documents that were requested. It concerned the category of documents that might be requested, which is every document that might be requested. That's correct. And I would wonder if it ranges in the millions, tens of millions, hundreds of thousands, 5,000. And it would be a very large number of documents, and it would not be practical to take those case by case, and then of those that might have some national security interest, go to the other. You don't have to go through everything. You have to go through the material that is requested. And you go through that material already. We do. There is a very large number of FOIA requests. And it takes forever to get the documents. The statute, we are not usually complying with the statute's 20-day turnaround. That's correct. The — I think I'll just note two more things. Petitioner's reading of the legislative history, I think, needs to be corrected in two respects. The 1964 Senate report that Petitioner relies upon talks about rules regarding parking lunch hours and sick leave. That does not concern Exemption 2. That provision is regarding what ultimately became section 552A.C.2. Alito, could I just nail down one particular point? It is the view of — you are representing the government, and it is the view of the problem that's highlighted here. Correct, because not all the documents here, even if there was time to review them, would fall within — excuse me, not in this case, but within the matter of Exemption 2, would not be able to be classified. Exemption 2 addresses a special problem. It addresses the problem of releasing documents where the very release would frustrate the function of having those documents in the agency — for the agency. And so there is no other exemption that does that. And in requiring Congress — remember, this has been the way this has worked for almost 30 years. There would have to be a very large number of Exemption 3 statutes Congress would have to go and act on one by one. It's not a feasible solution. Roberts. Thank you, counsel. Mr. Mann, you have 4 minutes remaining. The two points I'd like to focus again on, coming back to you, is the word personnel matters. When this case came to me, my client told me that he could not get these maps that he'd gotten previously because the Navy was classifying them as personnel documents. What is my reaction as a lawyer? What does — what? What are you talking about? I can read the language of this statute. It's talking about a narrow exception, which is exactly what Congress set up, nine narrow exceptions. The one open-ended one is the one that Congress kept for itself, Exemption 3. If the Navy doesn't believe that these documents can be or should be classified, but the Navy doesn't want to release these documents for some reason, then the Navy's recourse is to go to Congress, as other agencies have done, and seek a special protection for these documents. But it's not to distort the words of personnel practices and rules to expand to every document that is used by personnel. And that's precisely what the Navy's asking for. On page 51 of their brief, we responded to it in our reply, they're looking for an exemption that covers a wide range of information concerning internal rules and practices where disclosure would risk circumvention and where other FOIA exemptions are unavailable. They're asking you to create for them what they — what Congress wouldn't give them in 1964 or 66, broad discretion. And it doesn't belong — it certainly doesn't belong under the very narrow Exemption 2. If there are no other questions, I'm complete. Thank you, counsel. The case is submitted.